**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

PEG BALL; BENNIE JAMES, as
grandfather and guardian of Cree
James, a minor person; JEANNE
SPINKA, as an individual and as a
representative of a class of persons
similarly situated,
            *Plaintiffs-Appellees,*

and

VENETTA GRAHAM; PEGGY WILLIAM;
JUDETH HINTON; GRACE COLLIER;
VIRGINIA HASKELL; LARRY
WILLIAMS,
            *Plaintiffs-Intervenors-*
                        *Appellees,*

v.

ANTHONY D. RODGERS, Director of
the Arizona Health Care Cost
Containment System, THE ARIZONA
HEALTH CARE COST CONTAINMENT
SYSTEM ADMINISTRATION, and the
STATE OF ARIZONA,
            *Defendants-Appellants.*

No. 04-16963

D.C. No.
CV-00-00067-EHC

OPINION

Appeal from the United States District Court
for the District of Arizona
Earl H. Carroll, District Judge, Presiding

Argued September 12, 2006
Submitted July 17, 2007
San Francisco, California

Filed July 17, 2007

8567

Before: Betty B. Fletcher and Marsha S. Berzon,
Circuit Judges, and David G. Trager,* Senior Judge.

Opinion by Judge Berzon

---

*The Honorable David G. Trager, Senior United States District Judge
for the Eastern District of New York, sitting by designation.

## COUNSEL

Logan T. Johnston, Johnston Law Offices, Phoenix, Arizona, for the defendants-appellants.

Sally Hart and Jennifer L. Nye, Arizona Center for Disability Law, Tuscon, Arizona, and Sarah Lenz Lock, AARP Litigation, Washington, D.C., for the plaintiffs-appellees.

## OPINION

BERZON, Circuit Judge:

A certified class of elderly, physically disabled, and developmentally disabled Medicaid beneficiaries ("the Medicaid beneficiaries") alleges that Arizona is failing to provide them with adequate home- and community-based health care services, thereby violating several provisions of the federal Medicaid Act, 42 U.S.C. §§ 1396 *et seq.*[1] Defendant Anthony D. Rodgers — director of the Arizona Health Care Cost Containment System ("AHCCCS"),[2] the state agency that administers Arizona's Medicaid program — appeals a district court judgment permitting the case to proceed and holding, after a bench trial, that the state was indeed operating its Medicaid program inconsistently with federal requirements. Rodgers ("the Director" or "Arizona" or "the state") also appeals the district court's decision to grant the Medicaid beneficiaries permanent injunctive relief.[3]

Since the district court's judgment was entered, there has been an intervening change in our circuit's case law of critical

---

[1]Unless otherwise stated, all statutory citations are to 42 U.S.C.

[2]The acronym is pronounced "access."

[3]The district court's judgment was originally directed against Phyllis Biedess, former director of AHCCCS. Rodgers has since replaced Biedess.

importance to this case. The district court originally concluded that Arizona violated the Medicaid Act's "equal access" provision, § 1396a(a)(30)(A). We have since held that this provision does not accord Medicaid recipients individual rights enforceable under § 1983. *See Sanchez v. Johnson*, 416 F.3d 1051, 1059-60 (9th Cir. 2005). We therefore must reverse the judgment below insofar as it rests on this violation.

*Sanchez* does not, however, wholly determine this appeal. The district court separately held that Arizona violated two other Medicaid Act subsections, known as the "free choice" provisions, §§ 1396n(c)(2)(C) and (d)(2)(C).[4] Under these provisions, we conclude, Medicaid recipients enjoy rights that can be enforced in a § 1983 cause of action. For reasons that will be discussed *infra*, we do not go beyond that conclusion in this appeal. Instead we remand to the district court for further fact-finding and, if the facts and law so merit, entry of a new injunction tailored to the scope of the surviving claims. On remand, the district court should also consider whether Arizona violated the Americans with Disabilities Act ("ADA"), §§ 12131-12134, and Section 504 of the Rehabilitation Act of 1973, 29 U.S.C. § 794 — two claims that survived the summary judgment phase of the proceedings below but which the district court did not address in its post-trial decision.

# I

## A

On January 27, 2000, Peg Ball, Cree James, and Jeanne

---

[4]The Medicaid Act contains a third section sometimes referred to as a "freedom of choice" provision, § 1396a(a)(23). That section is concerned with patients' choice among medical assistance providers and is not at issue here. So when we refer in this opinion to the "free choice" provision, we refer, unless we state otherwise, to §§ 1396n(c)(2)(C) and (d)(2)(C).

Spinka filed a complaint seeking declaratory and injunctive relief against Rodgers and the state. Ball, James, and Spinka, like the class members they represent, each qualify for Medicaid, "a cooperative federal-state program that directs federal funding to states to assist them in providing medical assistance to low-income individuals." *See Katie A. v. Los Angeles County*, 481 F.3d 1150, 1153-54 (9th Cir. 2007); *see also* § 1396 (explaining that the purpose of Medicaid is to "enabl[e] each State, as far as practicable under the conditions in such State, to furnish . . . medical assistance on behalf of . . . individuals, whose income and resources are insufficient to meet the costs of necessary medical services").

Each plaintiff also qualifies for home- and community-based services ("HCBS") through a federal "waiver program" that allows states to give individuals who would otherwise be eligible to receive Medicaid benefits in a more traditional, long-term institution the option of receiving care in their homes or in community-based residences.[5] Congress enacted the HCBS waiver program "in response to the fact that a disproportionate percentage of Medicaid resources were being used for long-term institutional care and studies showing that many persons residing in Medicaid-funded institutions would be capable of living at home or in the community if additional support services were available. . . ." *See Sanchez*, 416 F.3d at 1054. States qualify for the program by applying to the Department of Health and Human Services and certifying to that agency that the cost of caring for a qualified individual through HCBS "will be less than or equal to the cost" of caring for him in an institution. *Id.*; *see also Bryson v. Shumway*, 308 F.3d 79, 82 (1st Cir. 2002) (describing application process and goals of the HCBS waiver program and explaining that the program is intended to be "expenditure-neutral").

---

[5]In the district court, this case was tried on the premise that Arizona's HCBS waiver program was authorized under § 1396n of the Medicaid Act. As will appear, the state now says that this is not the case. *See* discussion *infra* pp. 8608-09.

In Arizona, HCBS-eligible Medicaid recipients or their guardians can choose from a variety of noninstitutional care options, including adult foster care residences, assisted living homes, assisted living centers, hospices, or group homes. They also can elect to remain in their own homes. Under any of these noninstitutional care options, beneficiaries may qualify to receive regular living assistance from "attendant care workers." These workers report to the homes or community-based residences of Medicaid recipients, often daily, and, among other things, lift them out of their beds, place them in their wheelchairs, bathe them, help them use the bathroom, feed them, cook for them, administer shots, give medications, or accompany them on visits to the doctor or the grocery store. In other words, they make relatively independent lives possible for individuals who, medically speaking, are well enough that they do not require hospitalization or other forms of twenty-four-hour care.[6]

It is this particular benefit — the services of attendant care workers — that is the focal point of this class action. According to the Medicaid beneficiaries, their decision to opt for home- or community-based care was repeatedly compromised

---

[6]Lead plaintiff Ball, for example, is a wheelchair-bound quadriplegic, who suffers from spinal muscular atrophy. According to the complaint, Ball relies on attendant workers to lift her out of bed and into a motorized wheelchair as well as to help her with "dressing, bathing, eating, and toileting." Without this help, Ball alleges in the complaint, she would be unable to lead "an active and productive life," which involves running her own business out of her home and serving on a statewide committee focused on helping the physically disabled.

Named plaintiffs James and Spinka receive similar assistance from attendant care workers. James is a child who is a resident of a Navajo reservation located within Arizona's borders and has been diagnosed with periventricular leukomalacia, mental retardation, and developmental delay. According to the complaint, James "requires constant supervision, and assistance with all activities of daily living, including feeding and toileting," which attendant care workers provide. Spinka is a quadriplegic, who relies on attendant care workers to lift her out of bed and into a wheelchair, dress her, cook for her, and do housekeeping and shopping.

when state officials failed to provide them with adequate attendant-care-worker services. Their complaint describes scenarios in which attendant care workers "quit on short notice because they found better paying jobs" or where "no attendant care workers [were] available at all." On other occasions, the Medicaid beneficiaries alleged, the attendant care workers who arrived at their residences proved poorly trained. "If the shortfall in attendant care services is not corrected," their complaint asserted, "plaintiffs and other HCBS beneficiaries will be unable to continue living in their homes," and thus be compelled to move into the very institutions the HCBS waiver program was designed to help them avoid.

By forcing the Medicaid beneficiaries into this precarious position, they alleged, Arizona violated several federal statutes, including: (1) the Medicaid Act's "equal access" provision, § 1396a(a)(30)(A); (2) the Medicaid Act's "free choice" provisions, §§ 1396n(c)(2)(C) and (d)(2)(C); (3) provisions of the ADA that require that HCBS be made available to qualified individuals with disabilities, §§ 12131-34; and (4) Section 504 of the Rehabilitation Act of 1973, 29 U.S.C. § 794, and its implementing regulations.

**B**

After granting summary judgment to Arizona on several causes of action,[7] and deciding various procedural

---

[7]The Medicaid beneficiaries' complaint had alleged violations of: (1) § 1396a(a)(8), the Medicaid Act's "reasonable promptness" provision; (2) 42 C.F.R. § 435.930(b), a Medicaid Act implementing regulation which mandates that once an individual has been found eligible, the state agency must "furnish Medicaid regularly . . . until [he or she is] found to be ineligible"; (3) Arizona law, including Arizona Revised Statute §§ 36-2931 *et seq.*, and "the agreement in the Arizona State [Medicaid] Plan that HCBS . . . be provided to eligible persons"; (4) "the notice and hearing requirements" of the Fourteenth Amendment's Due Process Clause; (5) the Medicaid Act's "notice and fair hearing requirements," § 1396a(a)(3); 42

matters,[8] the district judge ultimately presided over a three-day bench trial. Testifying at the trial were Medicaid recipients, AHCCCS officials, subcontractors who employed attendant care workers on the state's behalf, and a labor economist, who offered evidence regarding the wage rate needed to attract a sufficient number of attendant care workers to the Medicaid market. The district court issued its final judgment in August 2004, holding that Arizona had violated both the Medicaid Act's equal access and the Act's free choice provisions by failing to provide the Medicaid beneficiaries with adequate HCBS. The decision made no mention of the ADA or Rehabilitation Act claims.

As part of its decision, the district court made several findings of fact, which we summarize here. To begin, the district court found that Arizona underpaid its attendant care workers

---

C.F.R. §§ 431.200 *et seq.*; and (6) the "notice, grievance and hearing requirement" of Arizona Revised Statute § 36-2903.01 and Ariz. Admin. Code R9-22-316. On May 8, 2002, the district court granted Arizona's cross-motion for summary judgment on each of these claims. The Medicaid beneficiaries have not cross-appealed that order.

The Medicaid beneficiaries' complaint also alleged that Arizona violated § 1396a(a)(10)(A)(ii)(VI), a Medicaid Act provision that requires that "[a] state plan for medical assistance" provide "home or community-based services" to individuals covered by a HCBS waiver granted to a state under §§ 1396n(c), (d), or (e). Although they moved for summary judgment on this claim, the district court never addressed it in its order granting summary judgment with respect to some claims and denying it with respect to others. It also never addressed this statute in its final, post-trial decision. Neither party has raised or briefed this claim on appeal.

[8]Two of these are worth noting: First, the district court granted a motion to intervene filed by six Arizona residents who also qualified for Medicaid and HCBS. Second, the court also granted the Medicaid beneficiaries' motion for class certification under Federal Rule of Civil Procedure 23(b)(2), defining the class as "includ[ing] all persons in the State of Arizona who have been or will be eligible for [HCBS] from [AHCCCS], but are not provided with the full amount of such services prescribed in their care plans."

as compared to what these workers could otherwise earn in the non-Medicaid home care market. This wage differential, it found, created a shortage of attendant care workers in the Medicaid system, a shortage that, in turn, both created "extensive waiting lists of beneficiaries who qualified for attendant care workers" and decreased the quality of care available for HCBS beneficiaries. The chronic shortfall of attendant care workers, the district court went on, would not have occurred had the state paid these workers more competitive wages — in particular, a $9- or $10-per-hour wage rate, rather than the $6.25- to $8.50-per-hour wage rate then in effect.

Aside from these findings concerning wages, the district court also found that other of Arizona's policies and procedures contributed to inadequate HCBS. For example, the state did not have contingency plans in place for those times when attendant care workers did not show up as scheduled; did not survey beneficiaries to ensure they were receiving adequate services; did not systematically monitor gaps in service; and did not have a grievance process in place so that beneficiaries could report these gaps.

Overall, the district court found, "[i]t is the policy of AHCCCS that an HCBS beneficiary assumes the risk, by choosing to remain at home rather than be institutionalized, that services he or she is depend[e]nt upon will not be delivered." The result of this policy, the district court continued, was exactly as the Medicaid beneficiaries had alleged in their original complaint: "On numerous occasions, each was left with no home health care attendant to care for them," which resulted in "grave consequences, such as complete immobility, hunger, thirst, muscle aches, and other physical and mental distresses." In support of these conclusions, the district court cited testimony from class members who spoke of "being trapped in bed unable to change position or care for personal hygiene, abandoned for hours in a bathroom, left without food or water . . . due to the lack or absence of health care providers." Based on these findings, the district court

concluded that Arizona had "failed to provide the representative class members with the equal access, quality of care, and freedom of choice to which they are entitled," and had thus violated § 1396a(a)(30)(A) and §§ 1396n(c)(2)(C) and (d)(2)(C), the equal access and free choice provisions of the Medicaid Act.[9]

To remedy these violations, the district court ordered extensive injunctive relief: The court ordered the state to increase the wages of attendant care workers to a more competitive rate;[10] to implement a grievance process, which would include, among other things, a hotline that HCBS beneficiaries could call to report a gap in "critical services";[11] and to develop contingency plans so that any gaps could be filled within four hours. The district court retained jurisdiction over the injunction so as to monitor Arizona's compliance.

---

[9]Arizona maintains on appeal that the district court never actually concluded that they had violated the free choice provisions, but that is not so. True, the district court's discussion of the free choice provisions is considerably more cursory than its discussion of the equal access provision. Still, the final judgment rests in part on the free choice provisions. *See Ball v. Biedess*, No. CIV 00-0067-TUC-EHC, slip op. at 12, ¶ 18 (D. Ariz. Aug. 13, 2004) (concluding that "[i]nstitutionalization is not a viable 'choice' for patients who qualify for AHCCCS programs but do not receive the services to which they are entitled," and citing to §§ 1396n(c)(2)(C) and (d)(2)(C)); *id.* ¶ 19 (holding that "[b]ased on the foregoing," AHCCCS administrators have a duty "to ensure compliance with quality care, equal access, and *freedom of choice* requirements" (emphasis added)); *id.* ¶ 20 (concluding that "defendants failed to provide . . . class members with the . . . freedom of choice to which they are entitled").

[10]The district court did not specify a rate. Instead, it ordered the state to consider several factors when computing wages, including "Medicare rates, private sectors rates, costs for delivering services, any economic factors unique to Arizona, and current levels of supply and demand."

[11]The injunction defines "critical services" as "personal care services" that include "bathing, toileting, dressing, feeding, transferring to or from beds or wheelchairs, and assistance with other similar daily activities." It defines "gaps" in critical services as the difference between the number of critical-service hours an HCBS recipient is scheduled to receive and the number of hours actually delivered.

Shortly after the district court issued its decision, Arizona filed a motion for a new trial or, in the alternative, a stay of the injunction. In particular, the state argued that evidence heard at the October 2003 bench trial was insufficient to support the injunction because it primarily concerned a state of affairs that existed prior to August 31, 2001, the date of the discovery deadline. As a result, Arizona contended, the evidence did not reflect the state's more recent efforts to ameliorate the attendant care worker problem. The district court denied both motions, stating, first, that the injunction already accounted for improvements achieved by the reforms and, second, that the state itself was responsible for any lack of evidence regarding conditions post-August 31, 2001, because it had objected when the Medicaid beneficiaries had previously asked the district court to extend the discovery deadline.

This appeal followed.

## II

Both parties have raised numerous issues on appeal, most of which, as will become apparent, cannot be decided without remand and further proceedings. Instead, we focus on whether the two primary causes of action alleged could go forward under any circumstances. If they cannot, then we would have to dismiss the case without more ado, and the factual, procedural, legal, and remedial issues on which we ultimately remand would not matter. It thus furthers judicial efficiency for us to decide now the logically antecedent question whether any cause of action could go forward under § 1983 for the violations alleged in the complaint if supported by the factual record.

So proceeding, we first address the effect of *Sanchez v. Johnson*, 416 F.3d at 1051, on the district court's conclusion that Arizona violated the Medicaid Act's equal access provision. We next turn our attention to the district court's alternate conclusion — that the state also violated the Medicaid Act's

free choice provisions — and consider whether these statutes provide Medicaid recipients with individual rights that can be enforced under § 1983. This latter analysis comprises the bulk of our opinion. After addressing these two issues, we define the scope of our remand to the district court.

## III

**[1]** Under the Medicaid Act's "equal access" provision,

> A State plan for medical assistance must . . . provide such methods and procedures relating to the utilization of, and the payment for, care and services available under the plan . . . as may be necessary to safeguard against unnecessary utilization of such care and services and to assure that payments are consistent with efficiency, economy, and quality of care and are sufficient to enlist enough providers so that care and services are available under the plan at least to the extent that such care and services are available to the general population in the geographic area.

§ 1396a(a)(30)(A). During the pendency of this appeal, we decided, in *Sanchez v. Johnson,* that the equal access provision does not confer individual rights enforceable under § 1983 upon recipients of Medicaid funds. 416 F.3d at 1060.

**[2]** In the district court and in the opening brief here, Arizona did not question the Medicaid beneficiaries' allegation that a cause of action lies under § 1983 for violation of Medicaid's equal access provision. Ordinarily, that omission would preclude consideration of the issue on appeal. *See Eberle v. City of Anaheim*, 901 F.2d 814, 818 (9th Cir. 1990) (explaining that "the general rule" in this circuit is that an issue is considered waived if the appellant does not properly raise it until his reply brief) (citing *Nw. Acceptance Corp. v. Lynnwood Equip., Inc.*, 841 F.2d 918, 924 (9th Cir. 1988)

(internal quotation marks omitted). We nonetheless address the question, under the "exception to the waiver rule . . . for intervening changes in the law." *See Big Horn County Elec. Co-op., Inc. v. Adams*, 219 F.3d 944, 953 (9th Cir. 2000).[12] As mandated by *Sanchez*, we reverse the district court's holding that Arizona is liable in this § 1983 action for violation of § 1396a(a)(30)(A).

## IV

[3] *Sanchez*, however, does not end our inquiry, as we must now separately consider the district court's conclusion that the state also violated §§ 1396n(c)(2)(C) and (d)(2)(C), the Medicaid Act's free choice provisions. Before we review this substantive holding, however, we consider a predicate question — namely, whether §§ 1396n(c)(2)(C) and (d)(2)(C) give Medicaid recipients individual rights whose violation can be remedied under § 1983. Although the district court assumed so, it never addressed this question, and although it is not jurisdictional, "and therefore may be assumed without being decided," we nevertheless elect to "consider it on the merits in light of the supplemental briefing provided by the parties." *See Price*, 390 F.3d at 1108 (citing *Lapidus v. Hecht*, 232 F.3d 679, 681 n.4 (9th Cir. 2000)); *see also* note 12 *supra*.[13]

---

[12]Both parties had an opportunity fully to address the effect of *Sanchez* on this appeal through supplemental briefs filed before argument.

We note that the issue of waiver is relevant because the question whether a statutory right of action exists goes to the merits of a claim, not our jurisdiction. *See Bell v. Hood*, 327 U.S. 678, 682 (1946) ("[I]t is well settled that the failure to state a proper cause of action calls for a judgment on the merits and not for a dismissal for want of jurisdiction."); *Price v. City of Stockton*, 390 F.3d 1105, 1108 (9th Cir. 2004) (per curiam) (explaining that the issue of whether a private right of action exists under § 1983 for enforcement of a federal statutory right "is not one of jurisdiction").

[13]Both parties addressed this question in a second round of supplemental briefing filed after argument.

Otherwise, the issue could well arise on remand and its reso-
lution challenged in a later appeal.

In doing so, we hold that the Medicaid beneficiaries enjoy
individual rights under §§ 1396n(c)(2)(C) and (d)(2)(C) that
can be enforced under § 1983. The language of the free choice
provisions is sufficiently "rights-creating," *see Gonzaga Univ.
v. Doe*, 536 U.S. 273, 287 (2002) (citing *Alexander v. Sando-
val*, 532 U.S. 275, 288-89 (2001), and *Cannon v. Univ. of
Chicago*, 441 U.S. 677, 690, 693 n.13 (1979)), and the rights
conferred by the two provisions are neither "vague and amor-
phous," nor impose upon states a merely precatory obligation*,
see Blessing v. Freestone*, 520 U.S. 329, 340-41 (1997). Fur-
thermore, § 1983 provides the proper avenue for relief
because Arizona has failed to show that Congress "fore-
closed" that option by adopting another, more comprehensive
enforcement scheme. *See Gonzaga*, 536 U.S. at 284, 285 n.4
(citing *Smith v. Robinson*, 468 U.S. 992, 1004-05, 1005 n.9
(1984)).

## A

In *Maine v. Thiboutot*, 448 U.S. 1, 4 (1980), the Supreme
Court concluded that the remedy afforded by § 1983 can be
used to bring actions against state actors for "violations of
federal statutory as well as constitutional law."[14] One year

---

[14]Under § 1983,

> Every person who, under color of any statute, ordinance, regula-
> tion, custom, or usage, of any State or Territory or the District of
> Columbia, subjects, or causes to be subjected, any citizen of the
> United States or other person within the jurisdiction thereof to the
> deprivation of any rights, privileges, or immunities secured by
> the Constitution *and laws*, shall be liable to the party injured in
> an action at law, suit in equity, or other proper proceeding for
> redress. . . .

(Emphasis added.)

The Supreme Court, in passing and with no decisional significance,
described *Thiboutot* as "the first time" it recognized "that § 1983 actions

later, the Court established two limitations on the use of § 1983 in enforcing federal statutes enacted pursuant to Congress's Spending Clause powers. First, in *Pennhurst State School and Hospital v. Halderman* the Court explained that in cases of "legislation enacted pursuant to the spending power, the *typical remedy* for state noncompliance with federally imposed conditions is not a private cause of action for noncompliance but rather action by the Federal Government to terminate funds to the State." 451 U.S. 1, 28 (1981) (emphasis added). Thus, the remedy recognized in *Thiboutot* applies with regard to federal statutes enacted under the Spending Clause only when "Congress 'speak[s] with a clear voice,' and manifests an 'unambiguous' intent to confer individual rights." *See Gonzaga*, 536 U.S. at 280 (quoting *Pennhurst*, 451 U.S. at 17, 28, and 28 n.21). Second, in *Middlesex County Sewerage Authority v. National Sea Clammers Ass'n*, 453 U.S. 1 (1981), the Court explained that "[w]hen the remedial devices provided in a particular Act are sufficiently comprehensive, they may suffice to demonstrate congressional intent to preclude the remedy of suits under § 1983." *Id.* at 20.

---

may be brought against state actors to enforce rights created by federal statutes," *see Gonzaga*, 536 U.S. at 279 (emphasis added), and we have repeated this observation in our own subsequent cases. *See, e.g.*, *Sanchez*, 416 F.3d at 1056. We note for purposes of historical accuracy that *Thiboutot* itself did not regard its holding as novel. Instead, *Thiboutot* stated that any question concerning whether § 1983 applies to violations of statutory rights "has been *resolved* by our several cases suggesting, explicitly or implicitly, that the § 1983 remedy broadly encompasses violations of federal statutory as well as constitutional law." *See Thiboutot*, 448 U.S. at 4 (emphasis added). *See also id.* at 4-6 (citing, as examples of such precedent, *Owen v. City of Independence*, 445 U.S. 622 (1980); *Monell v. N.Y. City Dep't of Soc. Servs.*, 436 U.S. 658 (1978); *Mitchum v. Foster*, 407 U.S. 225 (1972); *Lynch v. Household Fin. Corp.*, 405 U.S. 538 (1972); *Rosado v. Wyman*, 397 U.S. 397 (1970); *Greenwood v. Peacock*, 384 U.S. 808 (1966); *Hague v. CIO*, 307 U.S. 496 (1939)), and then citing a series of additional Supreme Court cases involving the Social Security Act as further support for the proposition that the Court, well before *Thiboutot*, had recognized that § 1983 can provide a cause of action to remedy federal statutory violations).

**[4]** Since *Pennhurst* and *Sea Clammers*, the Supreme Court has developed a three-prong framework for "determining whether a particular statutory provision gives rise to a federal right" redressable via § 1983.[15] *See Blessing*, 520 U.S. at 340. Specifically, courts must consider whether: (1) "Congress . . . intended that the provision in question benefit the plaintiff"; (2) the plaintiff has "demonstrate[d] that the right assertedly protected by the statute is not so 'vague and amorphous' that its enforcement would strain judicial competence"; and (3) "the statute . . . unambiguously impose[s] a binding obligation on the States," such that "the provision giving rise to the asserted right . . . [is] couched in mandatory, rather than precatory terms." *Id.* at 340-41 (citing *Wilder v. Va. Hosp. Ass'n*, 496 U.S. 498, 510-11 (1990), *superseded on other grounds by statute as discussed in Alaska Dep't of Health & Soc. Servs. v. Ctrs. for Medicare & Medicaid Servs.*, 424 F.3d 931, 941 (9th Cir. 2005), *Wright v. Roanoke Redevelopment and Hous. Auth.*, 479 U.S. 418, 430, 321-32 (1987); and *Pennhurst*, 451 U.S. at 17)).

In a 2002 decision, *Gonzaga University v. Doe*, the Court clarified the first of these three factors. As *Gonzaga* explained:

> Section 1983 provides a remedy only for the deprivation of "rights, privileges, or immunities secured by the Constitution and laws" of the United States.

---

[15]*Thibuotot*, *Pennhurst*, *Blessing*, *Gonzaga*, and *Sanchez* are all cases concerning federal statutes enacted pursuant to the Constitution's Spending Clause. Several of these cases stress the contractual nature of the federal-state relationship underlying such statutes. Whether the same degree of statutory clarity in creating rights enforceable under § 1983 is necessary outside the Spending Clause context is a question we need not consider today, as the Medicaid Act is also a Spending Clause statute. *Cf. Golden State Transit Corp. v. Los Angeles*, 493 U.S. 103 (1989) (holding with regard to the National Labor Relations Act, a statute enacted pursuant to the Commerce Clause rather than the Spending Clause, that a right implied from the structure of the statute but not explicitly stated is enforceable under § 1983).

Accordingly, it is *rights*, not the broader or vaguer "benefits" or "interests," that may be enforced under the authority of that section.

536 U.S. at 283. "This being so," the Court went on, "we further reject the notion that our implied right of action cases are separate and distinct from our § 1983 cases." Instead, the Court explained, that line of cases should "guide the determination of whether a statute confers rights enforceable under § 1983." *Id.* Certainly, *Gonzaga* acknowledged, the two inquiries differ, for unlike plaintiffs suing under an implied right of action, "[p]laintiffs suing under § 1983 do not have the burden of showing an intent to create a private remedy because § 1983 generally supplies a remedy for the vindication of rights secured by federal statutes." *Id.* at 284.[16] At the same time, however, both inquiries "overlap in one meaningful respect": "in either case [a court] must first determine whether Congress intended to create a federal right." *Id.* at 283 (emphasis omitted).[17]

---

[16]In an implied private right of action case, on the other hand, "[a] plaintiff . . . must demonstrate that Congress intended to create not only a private right but also a private remedy." *See Price*, 390 F.3d at 1109 n.3 (quoting *Sandoval,* 532 U.S. at 286); *see also Cort v. Ash*, 422 U.S. 66, 78 (1975) (where the Supreme Court enunciated a four-factor test to be applied in implied right of action cases); *Touche Ross & Co. v. Redington*, 442 U.S. 560, 575 (1979) (modifying the *Cort* test). Both parties here had the opportunity in their second round of supplemental briefs to address whether §§ 1396n(c)(2)(C) and (d)(2)(C) provide Medicaid recipients with an implied right of action. There is no need to separately address the implied right of action question, however, because we hold that these statutes confer individual rights enforceable under § 1983.

[17]The conceptual distinction between a right and a right of action that appears in *Gonzaga* is not unique to § 1983 law. The literature on rights, as distinct from rights of action, is vast and varied and, as it is at least as old as the Enlightenment, naturally predates the doctrines surrounding judicial enforceability of rights through claims brought by private parties. *See, e.g.,* Ronald Dworkin, TAKING RIGHTS SERIOUSLY, xi (1977) (rights as constraints on the state), Oliver Wendell Holmes, Jr., THE COMMON LAW, 214 (Dover, 1991) (1881) (characterizing a right as both a permission to

Under *Gonzaga*, evidence of such intent can be found in a statute's language as well as in its overarching structure. *Id.* at 286 (holding that "where the text and structure of the statute provide no indication that Congress intends to create new individual rights, there is no basis for a private suit"). In particular, the statute must be " 'phrased in terms of the persons benefited . . . . with an *unmistakable focus* on the benefited class.' " *Id.* at 284 (quoting *Cannon*, 441 U.S. at 691, 692, n.13) (emphasis in original); *see also id.* at 287 (holding that "there is no question" that the nondisclosure provisions of the Family Educational Rights and Privacy Act (FERPA) "fail to confer enforceable rights" because the "focus" of those provisions is "two steps removed from the interests of individual students and parents"); *Price*, 390 F.3d at 1110 (explaining that the "focus" of the provision should be "on individual entitlement to benefits rather than the aggregate or system-wide policies and practices of a regulated entity" (citing *Gonzaga*, 536 U.S. at 287-88)).

As examples of language in federal funding statutes that satisfies this standard, *Gonzaga* pointed to Title VI of the Civil Rights Act of 1964, which provides, in part, that "[n]o person in the United States shall . . . be subjected to discrimination," and Title IX of the Education Amendments of 1972, which similarly provides that "[n]o person in the United States shall, on the basis of sex, . . . be subjected to discrimination." *Id.* at 284 & n.3. In *Sanchez*, our circuit recognized that "our inquir[ies] should not be limited to looking for those

___

act but also as a right to the coercive force of the state to protect the substance of the right), Immanuel Kant, "On the Relationship of Theory to Practice in Political Right," *in* KANT'S POLITICAL WRITINGS, 73, 73 (H. Reiss ed. 1999) (1793) (characterizing rights as restrictions on individual freedoms used to harmonize community relations). Individuals have rights regardless of whether or not they may personally sue in court to enforce them, and those rights are valid with or without judicial intervention by any party. A right of action is merely one way in which a right may be used to constrain the state or other individuals.

precise phrases," although "statutory language less direct than the individually-focused 'No person shall . . .' must be supported by other indicia so unambiguous that we are left without any doubt that Congress intended to create an individual, enforceable right remediable under § 1983." 416 F.3d at 1058.

In addition to the language and structure of a statute, we have held, "[a]gency regulations . . . may be considered in applying the three-prong *Blessing* test," because "[a]s an agency interpretation of a statute, a regulation may be relevant in determining the scope of the right conferred by Congress." *See Save Our Valley v. Sound Transit*, 335 F.3d 932, 943 (9th Cir. 2003) (citing *S. Camden Citizens in Action v. New Jersey Dep't. of Envtl. Prot.*, 274 F.3d 771, 783 (3d Cir. 2001)); *see also Price*, 390 F.3d at 1112-13. Finally, we have sometimes turned to a statute's legislative history to help flesh out congressional intent regarding the creation of a federal right. *See, e.g.*, *Price*, 390 F.3d at 1111-12 (looking to congressional reports to ascertain what specific benefits legislators intended low and moderate income residents to enjoy under the Housing and Community Development Act).

## B

It is against this jurisprudential backdrop that we examine §§ 1396n(c)(2)(C) and (d)(2)(C), the free choice provisions of the Medicaid Act to determine whether it creates individual rights enforceable via § 1983.[18]

---

[18]There is no prior Ninth Circuit case addressing whether these two subsections confer individual rights enforceable via § 1983. The Sixth Circuit decided a near-identical question before both *Gonzaga* and *Blessing*. *See Wood v. Tompkins*, 33 F.3d 600, 611 (6th Cir. 1994) (holding that § 1396n(c)(2)(C) "give[s] rise to enforceable rights"). *Wood* applied the same factors *Blessing* prescribes, *id.* at 607-08, but the overall thrust of its analysis was focused on whether the overarching statutory provision — § 1396n(c)(2) — meets those standards. In *Blessing*, the Supreme Court explained that, when determining whether a federal statute confers individual rights, courts must engage in "methodical inquir[ies]" in which the

We begin our analysis with the language of the two stat-utes. As explained earlier, the HCBS waiver program allows states to be reimbursed for providing beneficiaries with nonin-stitutional care, so long as the cost of providing this care is less than or equal to the cost of caring for the same beneficia-ries in more traditional long-term institutions. *See infra* pp. 8573-74. HCBS waivers are only available, however, if a state provides certain "assurances" to the Secretary of Health and Human Services. *See* §§ 1396n(c)(2), (d)(2) ("A waiver shall not be granted under this subsection unless the State provides assurances satisfactory to the Secretary that . . . .").

Section 1396n(c)(2)(C), which is focused on HCBS for the disabled, codifies one such assurance. Under that provision, a state must guarantee that,

> such *individuals* who are determined to be likely to require the level of care provided in a hospital, nurs-ing facility, or intermediate care facility for the men-tally retarded *are informed of the feasible alternatives*, if available under the waiver, *at the choice of such individuals*, to the provision of inpa-tient hospital services, nursing facility services, or

---

rights claimed are "identif[ied] with particularity." *See* 520 U.S. at 342-43; *see also id.* at 344 (explaining that the "Court of Appeals erred . . . in taking a blanket approach to determining whether Title IV-D creates rights"). We therefore rely on *Wood* only to the extent that its analysis is specifically relevant to § 1396n(c)(2)(C).

Three district courts have more recently confronted the issue in pub-lished opinions, with two reaching the same conclusion as *Wood. See Michelle P. ex rel. Deisenroth v. Holsinger*, 356 F. Supp. 2d 763, 769 (E.D. Ky. 2005) (holding that § 1396n(c)(2)(C) confers individual rights enforceable under § 1983, but reaching this outcome somewhat summa-rily); *Cramer v. Chiles*, 33 F. Supp. 2d 1342, 1351 (S.D. Fla. 1999) (same)*; M.A.C. v. Betit*, 284 F. Supp. 2d 1298, 1307 (D. Utah 2003) (find-ing no individual right in § 1396n(c)(2)(C) that could be enforced under § 1983, but conducting an even briefer analysis of the issue than those dis-trict court decisions coming to the opposite conclusion).

services in an intermediate care facility for the mentally retarded.

(Emphases added.) Section 1396n(d)(2)(C) contains a closely analogous requirement, although it pertains to a different segment of the Medicaid population, the elderly. Under this provision, a state must guarantee the Secretary that,

> such *individuals* who are determined to be likely to require the level of care provided in a skilled nursing facility or intermediate care facility *are informed of the feasible alternatives* to the provision of skilled nursing facility or intermediate care facility services, which *such individuals may choose* if available under the waiver.

(Emphases added.)

[5] Based on the plain and precise language used in the statute, we conclude that Congress intended for the free choice provisions to confer upon the plaintiffs here — Medicaid recipients who qualify for HCBS — private rights that can be enforced via § 1983. First, both provisions twice use the word "individuals," and thus are " 'phrased in terms of the persons benefited.' " *See Gonzaga*, 536 U.S. at 284 (quoting *Cannon*, 441 U.S. at 692 n.13). Moreover, neither provision uses the word "individuals" simply in passing. Instead, both are constructed in such a way as to stress that these "individuals" have two explicitly identified rights — (a) the right to be informed of alternatives to traditional, long-term institutional care, and (b) the right to *choose* among those alternatives. The statutory provisions are, in other words, "concerned with 'whether the needs of any particular person have been satisfied,' " not solely with an aggregate "institutional policy and practice." *Id.* at 288 (quoting *Blessing*, 520 U.S. at 343).

Second, our initial assessment of §§ 1396n(c)(2)(C) and (d)(2)(C) is strengthened when we compare the text of these

two statutory provisions with the text of other Medicaid Act provisions that have been construed as conferring rights enforceable under § 1983. In each of those cases, the courts' analyses — like ours here — stressed that the statutes all prescribed rights owed to "individuals" or "eligible individuals," explicitly identified as such. While express use of the term "individuals" (or "persons" or similar terms) is not essential to finding a right for § 1983 purposes, usually such use is sufficient for that purpose.

In *Watson v. Weeks*, for instance, this circuit joined five federal circuits in holding that § 1396a(a)(10) satisfies the *Blessing-Gonzaga* standard. *See* 436 F.3d 1152, 1155, 1159-62 (9th Cir. 2006), *cert. denied sub nom. Goldberg v. Watson*, 127 S. Ct. 598 (Mem.) (2006). In relevant part, § 1396a(a)(10) provides that "[a] State plan for medical assistance must . . . provide . . . for making medical assistance available, . . . to . . . all [eligible] individuals . . . ." Our analysis in *Watson* was largely driven by the fact that the statute's "relevant phrase" assures "medical assistance available . . . *to all individuals*." *Id.* at 1160. "This language," we held, "is unmistakably focused on the specific individuals benefited." *Id.* (comparing the language of § 1396a(a)(10) to the statutory language at issue in *Price*, where this circuit held that a federal law mandating that "[e]ach grantee shall provide for reasonable benefits to any person" demonstrated "a clear intent" on the part of Congress "to create a federal right" (*Id.*, citing *Price*, 390 F.3d at 1111)).

*Watson*'s analysis was influenced, in part, by the Third Circuit's decision in *Sabree ex rel. Sabree v. Richman*, 367 F.3d 180 (3d Cir. 2004), so we consider that decision as well. *See Watson*, 436 F.3d at 1160 (relying on *Sabree*). In addition to § 1396a(a)(10), *Sabree* involved two other Medicaid Act provisions: (1) § 1396d(a)(15), which requires a state to provide medical assistance covering intermediate care facilities for the mentally retarded ("ICF/MR");[19] and (2) § 1396a(a)(8), other-

---

[19]In relevant part, § 1396d(a)(15) provides: "For purposes of this subchapter [§§ 1396 *et seq.*] . . . [t]he term 'medical assistance' means pay-

wise known as the Medicaid Act's "reasonable promptness pro-vision."[20] In each instance, *Sabree* concluded, the "individual focus" of the three provisions was "unmistakable," given that each "enumerate[s] the entitlements available to 'all eligible individuals' and none "focus on 'the [entity] . . . regulated rather than the individuals protected.' " *Id.* at 190 (citing *Alexander*, 532 U.S. at 289) (second alteration in original). *See also S.D. ex rel. Dickson v. Hood*, 391 F.3d 581, 603 (5th Cir. 2004) (concluding that § 1396a(a)(10) features "precisely the sort of 'rights-creating' language identified in *Gonzaga* as critical to demonstrating a congressional intent to establish a new right"); *Bryson*, 308 F.3d at 88-89 (holding that "there is a § 1983 cause of action arising from . . . § 1396a(a)(8), in part, because "the statute, on its face, does intend to benefit plaintiffs" given its use of the term "eligible individuals").

For analogous reasons, in *Harris v. Olszewski*, 442 F.3d 456 (6th Cir. 2006), the Sixth Circuit held that § 1396a(a)(23) created individual rights enforceable under § 1983. That Med-icaid Act provision — which, as we have noted, *see supra* note 4, is also referred to as a "freedom of choice" provision — mandates, in relevant part, that "[a] State plan for medical assistance must . . . provide that [ ] *any individual eligible* for medical assistance . . . may obtain such assistance from any institution, agency, community pharmacy, or person" quali-fied to perform such a service. 442 F.3d at 461 (citing § 1396a(a)(23)) (emphasis added). "In giving 'any individual eligible for medical assistance' a free choice over the provider of that assistance," *Harris* explained, "the statute uses the kind of 'individually focused terminology' that 'unambigu-

---

ment of part or all of the cost of the following care and services . . . for individuals . . . who are [eligible:] . . . services in an [ICF/MR] . . . ."

[20]In relevant part, § 1396a(a)(8) provides: "A State plan for medical assistance must . . . provide that *all individuals* wishing to make applica-tion for medical assistance under the plan shall have opportunity to do so, and that such assistance shall be furnished *with reasonable promptness to all eligible individuals*." (Emphases added.)

ously confer[s]' an 'individual entitlement' under the law." *Id.* (quoting *Gonzaga*, 536 U.S. at 283, 287).

**[6]** The upshot is that, like the language of §§ 1396a(a)(8), 1396a(a)(10), 1396a(a)(23), and 1396d(a)(15), the language of §§ 1396n(c)(2)(C) and (d)(2)(C) satisfies the "rights-creating" standard set forth in *Gonzaga*, and thus clears the first hurdle of the *Blessing* framework. As in these other statutes, the free choice provisions are focused on the rights owed to HCBS-eligible Medicaid recipients, as evinced through their repeated use of the word "individuals" and their specific articulation of the entitlements guaranteed — in this instance, the right to be informed of alternatives to traditional, institutional care and the right to choose from among those options.

## C

**[7]** This conclusion also follows from a comparison of §§ 1396n(c)(2)(C) and (d)(2)(C) both to other Medicaid Act provisions that we have held do not create individual rights enforceable via § 1983, and to the other federal statutes similarly construed in *Blessing* and *Gonzaga*. In each of those cases, the statutes at issue differed from the free choice provisions here in that they do not mention the service recipients, or refer to them in the aggregate, or refer to them in the context of describing a more general institutional policy or practice.

In *Sanchez*, for example, we held that the Medicaid Act's equal access provision, § 1396a(a)(30)(A), does not confer individual rights. We noted that the section's only "reference . . . to recipients of Medicaid services is in the aggregate, as members of 'the general population in the geographic area,' " 416 F.3d at 1059, and further explained that "[t]he statute speaks not of any individual's right but of the State's obligation to develop 'methods and procedures' for providing services generally".[21] *Id.* "A statutory provision that refers to the

---

[21]Under 1396a(a)(30)(A),

A State plan for medical assistance must provide . . . such meth-

individual only in the context of describing the necessity of developing state-wide policies and procedures," we explained, "does not reflect a clear Congressional intent" to create individual rights enforceable under § 1983. *Id*.; *see also San Lazaro Ass'n, Inc. v. Connell*, 286 F.3d 1088, 1099 (9th Cir. 2002) (holding that § 1396a(a)(5) did not give Medicaid providers a right of action under § 1983 because it is "a structural programmatic requirement that facilitates federal oversight of state Medicaid programs," adding that "[t]o the extent there is a benefit to . . . individuals, it is an indirect one");[22] *Watson*, 436 F.3d at 1162 (explaining that § 1396a(a)(17), unlike § 1396a(a)(10), "is not framed in terms of the individuals benefited" and is focused on "aggregate impact, rather than on the benefits to individuals").[23]

Any concern for individual children and custodial parents was found to be similarly sidelined in the "substantial compliance" requirement of Title IV-D of the Social Security Act discussed in *Blessing*. 520 U.S. at 343-44. This requirement, the Court wrote, was "designed only to guide the State in structuring its systemwide efforts at enforcing support obliga-

---

ods and procedures relating to the utilization of, and the payment for, care and services available under the plan . . . as may be necessary to safeguard against unnecessary utilization of such care and services and to assure that payments are consistent with efficiency, economy, and quality of care and are sufficient to enlist enough providers so that care and services are available under the plan *at least to the extent that such care and services are available to the general population in the geographic area.*

(Emphasis added).

[22]Under § 1396a(a)(5), a participating state must "provide for the establishment or designation of a single State agency to administer or to supervise the administration of the [State's] plan."

[23]Under § 1396a(a)(17), a state plan for medical assistance "must . . . include reasonable standards (which shall be comparable for all groups . . .) for determining eligibility for and the extent of medical assistance under the plan."

tions," not to provide rights to individual beneficiaries. *Id.* at 344; *see also id.* at 343 (explaining that the statute served as "simply a yardstick for the Secretary [of Health and Human Services] to measure the *systemwide* performance of State's Title IV-D program") (emphasis in original). That much was clear, the Court found, given that a state's failure to "substantially comply" would never lead the Secretary of Health and Human Services to "command the State to take any particular action or to provide any services to certain individuals." *Id.* at 344. Instead, such a failure would "simply . . . trigger penalty provisions that increase the frequency of audits and reduce the state's [federal] grant." *Id.* In other words, although the "substantial compliance" requirement conceivably benefited individual plaintiffs in an indirect fashion — for example, by giving states financial incentives to try and adhere to federal directives — this type of impact was not enough to compel the conclusion that Congress intended for Title IV-D's "substantial compliance" requirement to create rights enforceable via § 1983. *Id.*

The same is true in *Gonzaga*. There the Court interpreted FERPA's nondisclosure provisions as only indirectly benefiting individual plaintiffs. Although the statute referenced both "students" and "parents," *see* 536 U.S. at 279 (quoting 20 U.S.C. § 1232g(b)(1)),[24] the Court concluded that neither class of potential plaintiffs was the statute's focal point, *id.* at 287-88. Instead, as the Court explained, the FERPA provision was far more concerned with Congress's directive that the Secretary of Education not release federal funds to any "educa-

---

[24] Under 20 U.S.C. § 1232g(b)(1),

> No funds shall be made available under any applicable program to any educational agency or institution which has a policy or practice of permitting the release of education records (or personally identifiable information contained therein . . .) of *students* without the written consent of their *parents* to any individual, agency, or organization. . . .

(Emphases added.)

tional agency or institution" with a particular "policy or practice" — namely, the policy or practice of releasing students' educational records without the consent of their parents. *Id.* at 287; *see also id.* at 289-90 (detailing the Secretary's role in dealing with violations of the FERPA provision). Thus, while students and parents as groups might be considered indirect beneficiaries of the regulatory scheme, the statute required only a general "policy" or "practice," not compliance in individual instances *Id.* (explaining that the statute's "focus is two steps removed from the interests of individual students and parents").

When set alongside the statutes at issue in cases like *Sanchez*, *Blessing*, and *Gonzaga*, the free choice provisions involved in this appeal stand apart in every relevant respect. Unlike the "equal access" provision, they are not designed simply to ensure that entire populations of Medicaid recipients receive services in the aggregate equivalent to those received by their non-Medicaid counterparts. Instead, they seek to guarantee that *individual* patients are informed of non-institutional care options and that *individual* patients retain the right to make a choice based on this information. And unlike the plaintiffs seeking to sue under the "substantial compliance" provisions discussed in *Blessing* and the "policy or practice" provision in *Gonzaga*, the HCBS-eligible Medicaid recipients who comprise the plaintiff-class here are not simply cogs in a grander statutory scheme. If that were the case, then Congress would have just enacted a barebones HCBS program, one that would have reimbursed states for providing alternatives to institutional care, and stopped there. There would have been no need for Congress also to enact provisions mandating that participating states keep *each* eligible Medicaid recipient apprised of these non-institutional care options and afford *each* the opportunity to choose how to live.

Arizona tries to detract from the individual-oriented nature of the free choice provisions by arguing that §§ 1396n(c)(2)(C) and (d)(2)(C) only codify those assurances

that it must make as part of its application for an HCBS waiver. As a result, the state contends, the provisions' objective is not to benefit HCBS-eligible Medicaid recipients directly, but rather to give structure to a state's HCBS program by setting forth specific preconditions for federal funding. Arizona's argument fails, however, because Congress has explicitly legislated that a Medicaid Act provision cannot be construed as unenforceable under § 1983 "merely because it requires action under a state plan." *See Watson*, 436 F.3d at 1161 (citing *S.D.*, 391 F.3d at 603).

Codified as § 1320a-2, this congressional directive is commonly referred to as the "*Suter* fix" because, through its enactment Congress overturned an aspect of S*uter v. Artist M.*, 503 U.S. 347 (1992), that did indeed support the Director's current position. In *Suter*, the Supreme Court held that a provision of the Adoption Assistance and Child Welfare Act, §§ 620-628, did not create an enforceable right under § 1983. 503 U.S. at 363. The analysis in *Suter* emphasized the fact that the particular provision at issue there, § 671(a)(15), required a state to compile a sixteen-feature plan and submit it for approval to the Secretary of Health and Human Services, before it could "obtain federal reimbursement." *Suter*, 503 U.S. at 358. The statute further dictated that the plan had to "provide[ ] that, in each case, reasonable efforts will be made . . . to prevent or eliminate the need for removal of the child from his home, and . . . to make it possible for the child to return to his home . . . ." *Id.* (quoting § 671(a)(15)). Relying upon this "reasonable efforts" language, *Suter* concluded that the statute did "not unambiguously confer an enforceable right upon the Act's beneficiaries," because "the term 'reasonable efforts' in this context is at least as plausibly read to impose only a rather generalized duty on the State, to be enforced not by private individuals, but by the Secretary in the manner previously discussed." *Id.* at 363.

In direct response to *Suter*, Congress enacted § 1320a-2, which provides:

In an action brought to enforce a provision of [the Social Security Chapter of the United States Code],[25] *such provision is not to be deemed unenforceable because of its inclusion in a section of this chapter requiring a State plan or specifying the required contents of a State plan.* This section is not intended to limit or expand the grounds for determining the availability of private actions to enforce State plan requirements other than by overturning any such grounds applied in *Suter v. Artist M.*, . . .

(Emphasis added.)

Since the adoption of this statute, courts around the country have relied on it in holding some Medicaid Act rights enforceable under § 1983 even where the statute's "rights-creating" language is embedded within a requirement that a state file a plan or that that plan contain specific features.[26] The "*Suter* fix" requires that we, likewise, reject the Director's argument that §§ 1396n(c)(2)(C) and (d)(2)(C) were enacted simply to set forth a policy or practice upon which the receipt of federal funds is conditioned.

---

[25]Section 1396n(c)(2)(C) and (d)(2)(C) are provisions under the Social Security Act, as Medicaid was established in 1965 by Title XIX of the Social Security Act. *See Alexander v. Choate*, 469 U.S. 287, 289 n.1 (1985).

[26]*See, e.g.*, *S.D.*, 391 F.3d at 603 (concluding that § 1396a(a)(10)(A), under which a state Medicaid plan must provide specific kinds of medical assistance, "confers rights enforceable by § 1983," and explaining that "[t]he requirement of action under a plan is not . . . dispositive of [that] question," given § 1320a-2"); *Harris v. James*, 127 F.3d 993, 1003 (11th Cir. 1997) (in case involving Medicaid Act regulations requiring state Medicaid plans guarantee transportation for recipients to and from providers, explaining that "in light of [§ 1320a-2], it is clear that the mere fact that an obligation is couched in a requirement that the State file a plan is not itself sufficient grounds for finding the obligation unenforceable under § 1983"); *see also Watson*, 436 F.3d at 1160-61 (relying on the court's analysis in *S.D.* regarding the "*Suter* fix").

To be sure, under §§ 1396n(c)(2)(C) and (d)(2)(C), a state is required to include certain assurances in its application for an HCBS waiver. And the statute's implementing regulations make clear that a state's failure to fulfill these assurances can result in a termination of the HCBS waiver program. *See* 42 C.F.R. § 441.302 ("Unless the Medicaid agency provides the following satisfactory assurances to [the Centers for Medicare & Medicaid Services ("CMS")],[27] CMS will not grant a waiver . . . and may terminate a waiver already granted . . . ."). Yet, the role §§ 1396n(c)(2)(C) and (d)(2)(C) play in delineating the mandatory contents of a state HCBS plan cannot detract from or override the otherwise clear "rights-creating" language Congress used in enacting the free choice provisions. To do so would be to ignore Congress's directive in the "*Suter* fix" statute that courts abjure reliance on that consideration.

**[8]** We therefore hold that §§ 1396n(c)(2)(C) and (d)(2)(C) demonstrate an unambiguous intent by Congress to confer rights on individuals in the plaintiff class, thus satisfying the first prong of the *Blessing* framework.

## D

**[9]** This conclusion — that, owing to their text and structure, the free choice provisions satisfy the first prong of the *Blessing* test — is further corroborated by a look at the overall context of the HCBS waiver program. Relevant surrounding statutes, agency regulations, and legislative history all indicate that Congress enacted the free choice provisions with the health and welfare of individual Medicaid beneficiaries the paramount consideration, thereby supporting the conclusion that Congress intended §§ 1396n(c)(2)(C) and (d)(2)(C) to provide Medicaid beneficiaries individual rights.

---

[27]CMS is housed within the Department of Health and Human Services.

*First*, §§ 1396n(c)(2)(C) and (d)(2)(C) do not operate in a vacuum. Instead, under §§ 1396n(c)(2) and (d)(2), a state must make additional assurances to the Secretary of Health and Human Services before it can receive an HCBS waiver. At least two such assurances — like the assurance codified in §§ 1396n(c)(2)(C) and (d)(2)(C) — focus on the needs of individual Medicaid beneficiaries. Specifically, under § 1396n(c)(2)(B), a state must provide,

> *with respect to individuals* who —
>
>> (i) are entitled to medical assistance for inpatient hospital services, nursing facility services, or services in an intermediate care facility under the State plan,
>>
>> (ii) may require such services, and
>>
>> (iii) may be eligible for such home or community-based services under such waiver,
>
> for an evaluation of the need for inpatient hospital services, nursing facility services, or services in an intermediate care facility for the mentally retarded . . . .

(Emphasis added.) Section 1396n(d)(2)(B) requires states to make a similar assurance before receiving an HCBS waiver.[28]

---

[28]Specifically, that provision mandates,

> *with respect to individuals 65 years of age or older* who —
>
>> (i) are entitled to medical assistance for skilled nursing or intermediate care facility services under the State plan,
>>
>> (ii) may require such services, and
>>
>> (iii) may be eligible for such home or community-based services under such waiver,
>
> the State will provide for an evaluation of the need for such skilled nursing facility or intermediate care facility services . . .

(Emphasis added.)

The provisions' use of the word "individuals," in such a direct and active fashion, strengthens our initial determination that the notion that Congress intended for at least some of the subsections under §§ 1396n(c)(2) and (d)(2) to confer individual rights, because they evince "an *unmistakable focus* on the benefited class."[29] *Gonzaga*, 536 U.S. at 284 (emphasis in original) (quoting *Cannon*, 441 U.S. at 691).

*Second*, the relevant implementing regulations lend additional support to our conclusion. To begin, 42 C.F.R. § 441.302(d) is the regulation that specifically implements §§ 1396n(c)(2)(C) and (d)(2)(C). *See* 42 C.F.R. § 441.300 (specifying that this regulatory subpart contains all waiver requirements); *Wood*, 33 F.3d at 603. Under § 441.302(d), for a state to receive an HCBS waiver, it must assure the Secretary of Health and Human Services that

> when a *recipient* is determined to be likely to require the level of care provided in a hospital, [nursing facility], or [intermediate care facility for the mentally retarded], the *recipient* or his or her legal representative will be —
>
> > (1) *Informed of any feasible alternatives* available under the waiver; and
> >
> > (2) Given the *choice* of either institutional or home and community-based services.

(Emphases added.) Section 441.302(d) thus mimics the "rights-creating" language of the statute. *See Gonzaga*, 536

---

[29]That some of the surrounding provisions are more focused on general policies and practices than individual Medicaid recipients does not detract from the conclusion that Congress intended for *other* provisions codified under § 1396n to confer individual rights. *See Blessing*, 520 U.S. at 342 (explaining that the rights "identif[ied] with particularity" can be enforced under § 1983 even if other provisions of the same statute are concerned with aggregate policy and may not be enforced under § 1983).

U.S. at 287. As explained earlier, although an agency regulation cannot confer an individual right enforceable under § 1983, it may still "be relevant in determining the scope of the right conferred by Congress" and "Congress's intent." *See Save Our Valley*, 335 F.3d at 943 (citing *S. Camden Citizens in Action*, 274 F.3d at 783); *Price*, 390 F.3d at 1112-13 (stating that when "[r]ead together" with Section 104(k) of the Housing and Community Development Act, the corresponding agency regulations "confirm Congress's intent not only to impose a plan certification requirement on grantees, but also to confer upon persons displaced by redevelopment activities an enforceable entitlement to the specific benefits of such plans").

Moreover, that some of the regulations neighboring § 441.302(d) are couched in similar, individual-oriented language underscores the depth of Congress's intention. *See, e.g.*, § 441.302(c)(1) (explaining that a state agency must guarantee that it will conduct an initial evaluation of individual recipients' medical needs); *id.* § 441.302(c)(2) (explaining that a state must guarantee that it will conduct "[p]eriodic reevaluations . . . . at least annually, of each recipient receiving [HCBS] to determine if the recipient continues to need the level of care provided and would, but for the provision of waiver services, otherwise be institutionalized").

*Finally*, the legislative history of §§ 1396n(c)(2)(C) and (d)(2)(C) highlights the fact that Congress's main concern when enacting the free choice provisions was the health and welfare of individual Medicaid recipients, not any potential cost-savings that might result from a shift away from institutionalization. This is a critical point. True, at least some of the subsections under §§ 1396n(c)(2) and (d)(2) "were obviously designed to save the government money." *See Wood*, 33 F.3d at 607-08 (citing § 1396n(c)(2)(D) as "providing that home care costs may not exceed the cost of institutional care").[30]

---

[30]Specifically, under § 1396n(c)(2)(D), a state must guarantee that

under such waiver the average per capita expenditure estimated

There is also a statutory provision mandating fiscal responsibility. *See* §§ 1396n(c)(2)(A), (d)(2)(A) (requiring that states guarantee that "necessary safeguards . . . have been taken . . . to assure financial accountability for funds expended with respect to [HCBS]"). Yet, although Congress was quite aware that HCBS might "have a long range and significant impact on the size of states' Medicaid budgets," legislators were adamant that "[t]he determination of which long-term care options are feasible in a particular instance should be based on *an individual's needs*, as determined by an evaluation, *and not short-term cost-savings*." H.R. REP. 97-208, at 966 (1981) (Conf. Rep.), *as reprinted in* 1981 U.S.C.C.A.N. 1010, 1328 (emphasis added); *see also id.* (explaining that through the adoption of the HCBS waiver program, "the integrity of patient choice should be preserved"); S. REP. 97-139, at 747-48 (1981) (acknowledging that "certain cost savings may result," but stressing that "[a] waiver cannot be granted unless the state provides assurances satisfactory to the Secretary that necessary safeguards have been taken to protect the health and welfare of *any* of the recipients of such services" (emphasis added)).

The result of our examination of the overall context of the HCBS waiver program, including the relevant statutes, implementing regulations, and legislative history, underscores our initial text-based view that Congress consciously used "explicit rights-creating terms" when enacting Medicaid Act's free choice provisions. *See Gonzaga*, 536 U.S. at 283-84. In light of this additional, corroborative analysis, we reiterate our earlier holding — namely, that Congress intended §§ 1396n(c)(2)(C) and (d)(2)(C) to "create a federal right,"

---

by the State in any fiscal year for medical assistance provided with respect to such individuals does not exceed 100 percent of the average per capita expenditure that the State reasonably estimates would have been made in that fiscal year for expenditures under the State plan for such individuals if the waiver had not been granted.

and that the two provisions thus satisfy the first prong of the *Blessing* framework. *Id.* at 283 (emphasis omitted).

**E**

Our analysis cannot, however, end there. We must consider whether §§ 1396n(c)(2)(C) and (d)(2)(C) also satisfy the *Blessing* framework's second and third prongs.

**[10]** Under the framework's second factor, a plaintiff must "demonstrate that the right assertedly protected by the statute is not so 'vague and amorphous' that its enforcement would strain judicial competence." 520 U.S. at 340-41. The "free choice" provisions before us easily satisfy this standard. Those provisions set forth explicit rights — again, the right to be informed of alternatives to institutional care and the right to choose from among those alternatives. A court can readily determine whether a state is fulfilling these statutory obligations by looking to sources such as a state's Medicaid plan, agency records and documents, and the testimony of Medicaid recipients and providers. *Cf. Harris*, 442 F.3d at 462 (holding that § 1396a(a)(23), the "freedom of choice" provision, satisfies the second *Blessing* prong, because "[w]hether a state plan provides an individual with the choice specified in the provision is likely to be readily apparent").

This is not a situation, in other words, like that presented in *Sanchez*. There, we concluded that "[t]he language of [the equal access provision] [was] . . . ill-suited to judicial remedy," because the "interpretation and balancing of the statute's indeterminate and competing goals would involve making policy decisions for which [a] court has little expertise and even less authority." 416 F.3d at 1060. Although § 1396a(a)(30)(A) would require a court to account for numerous, largely unquantifiable variables — "efficiency, economy, and quality of care" — the rights at issue here are far more straightforward. We are confident that a court could capably ensure the enforcement of these two statutes, and

therefore conclude that §§ 1396n(c)(2)(C) and (d)(2)(C) satisfy the second prong of the *Blessing* framework.

Arizona contends otherwise, maintaining that the rights conferred by §§ 1396n(c)(2)(C) and (d)(2)(C) are, indeed, too "vague and amorphous" for a court to administer effectively. As construed by the Medicaid beneficiaries, the state suggests, the free choice provisions would require a court to assess the "particular quality, quantity, consistency, or frequency" of a state's HCBS waiver program. As a result, it argues, the requirements established by §§ 1396n(c)(2)(C) and (d)(2)(C) are no more readily ascertainable than those traceable to § 1396a(a)(30)(A).

This argument, however, is inapposite to our present inquiry. That rights enforceable under § 1983 cannot be excessively vague and amorphous may ultimately have an impact on any merits analysis under §§ 1396n(c)(2)(C) and (d)(2)(C). If the Medicaid beneficiaries indeed seek to interpret their rights under the "free choice" provisions so expansively that they truly become "vague and amorphous," their cause of action may fail on the merits. For, in that event, the Medicaid beneficiaries will not be able to show that Arizona violated their rights enforceable under § 1983. The cause of action should not fail at the threshold, however, on the grounds that on *any* interpretation of the "free choice" provisions, the individual rights established are too "vague and amorphous" for a court to enforce.

In that same vein, Arizona points to a recent Tenth Circuit decision, in which that court wrote — in language that the state recognizes is dicta — that although Colorado's HCBS waiver application "suggests that a developmentally disabled person will have a choice between an ICF/MR and HCBS, it does not assign to the State, or any other party, the responsibility to ensure that such facilities are in fact available." *See Mandy R. ex rel. Mr. and Mrs. R. v. Owens*, 464 F.3d 1139, 1145 (10th Cir. 2006) (so stating in the context of deciding

whether the state violated §§ 1396a(a)(8) and (a)(10)(B)(i)). Although Arizona appears to rely on this statement from *Mandy R.* to support its argument that the "free choice" provisions confer no individual rights enforceable under § 1983, the statement — at best — speaks to what constitutes a *substantive* violation of §§ 1396n(c)(2)(C) and (d)(2)(C), an issue we do not address.

**[11]** The final *Blessing* factor — whether "the statute . . . unambiguously impose[s] a binding obligation on the States," 520 U.S. at 347 — is perhaps most obviously met by the free choice provisions. Under §§ 1396n(c)(2) and (d)(2), a state must make certain assurances to the Secretary of Health and Human Services to obtain an HCBS waiver. *See, e.g.*, § 1396n(c)(2) ("A waiver *shall not* be granted . . . unless the State provides assurances . . . that . . . .") (emphasis added). The Director argues that these assurances are only precatory, given the overall optional nature of the HCBS waiver program. Nothing in the Medicaid Act, after all, requires a state to make non-institutional care options available to its recipients. The fact remains, however, that once a state does elect a HCBS waiver, it is bound to provide its HCBS-eligible patient population with specific rights and services, among them those included in §§ 1396n(c)(2)(C) and (D)(2)(C). The third prong of the *Blessing* framework is thus satisfied.

**F**

**[12]** Having satisfied all three prongs of the *Blessing* framework, the Medicaid beneficiaries' rights under §§ 1396n(c)(2)(C) and (d)(2)(C) are "presumptively enforceable by § 1983," subject only to a showing by the state that "Congress 'specifically foreclosed a remedy under § 1983.' " *Gonzaga*, 536 U.S. at 284 & n.4 (citing *Smith v. Robinson*, 468 U.S. 992, 1004-05, 1005 n.9 (1984)). A state can meet this burden by "demonstrat[ing] that Congress shut the door to private enforcement either expressly, through 'specific evidence from the statute itself,' . . . or 'impliedly, by creating

a comprehensive enforcement scheme that is incompatible with individual enforcement under § 1983.' " *Id.* at 284 n.4 (citing *Wright*, 479 U.S. at 423; *Blessing*, 520 U.S. at 341; and *Sea Clammers*, 453 U.S. at 20); *see also City of Rancho Palos Verdes v. Abrams*, 544 U.S. 113, 121-22 (2005) (describing the few instances in which the Court has found § 1983 not available "to remedy violations of federal statutory rights," because it found "the existence of more restrictive remedies . . . in the violated statute itself").

**[13]** Arizona has not attempted to rebut the presumption that the Medicaid beneficiaries' rights under §§ 1396n(c)(2)(C) and (d)(2)(C) are enforceable via § 1983. And with good reason. In *Blessing*, the Supreme Court made clear that the power of "the Secretary of Health and Human Services . . . to reject state Medicaid plans or to withhold federal funding to States whose plans did not comply with federal law" cannot foreclose a § 1983 remedy. 520 U.S. 347-48 (citing *Wilder*, 496 U.S. at 521, 523); *see also Harris*, 442 F.3d at 463 (holding that the fact "[t]hat the Federal Government may withhold federal funds to non-complying States is not inconsistent with private enforcement," and citing *Wilder*, 496 U.S. at 521-22, for the proposition that "although the Medicaid Act 'authorizes the Secretary to . . . curtail federal funds to States whose plans are not in compliance with the Act, . . . [t]his administrative scheme cannot be considered sufficiently comprehensive to demonstrate a congressional intent to withdraw the private remedy of § 1983"). As no remedy for the enforcement of §§ 1396n(c)(2)(C) and (d)(2)(C), other than withholding federal funds, has been brought to our attention by the parties, we cannot foreclose a § 1983 remedy.

\* \* \* \*

**[14]** In light of the foregoing analysis, we conclude that the Medicaid beneficiaries enjoy "unambiguously conferred" individual rights under §§ 1396n(c)(2)(C) and (d)(2)(C) and

that those rights can be properly enforced through a § 1983 cause of action.

## V

**[15]** Having decided that §§ 1396n(c)(2)(C) and (d)(2)(C) provide a right of action under which Medicaid beneficiaries can protect their individual rights, we now remand the matter to the district court so that it can: (1) if appropriate, make a factual determination as to which federal statutes apply in this case;[31] (2) have the opportunity to decide whether there are other legal bases upon which to grant the Medicaid beneficiaries relief; and (3) amend the terms of the current injunction as needed.

(1)   In a supplemental brief filed after argument, Arizona for the first time contends that the Medicaid beneficiaries' suit cannot go forward under the Medicaid Act's free choice provisions because, as a factual matter, Arizona's waiver program, permitting home- and community-based care, was actually authorized under a different federal statute — 42 U.S.C. § 1315 of the Social Security Act. As a result, Arizona maintains, it is not bound to comply with any provision of § 1396n, including the free choice requirements.[32] In response, the Medicaid beneficiaries argue that even if § 1315 serves as the statutory basis for Arizona's HCBS waiver program, the state is still bound to comply with various provisions of the Medicaid Act, including §§ 1396n(c)(2)(C) and (d)(2)(C). In the alternative, the Medicaid beneficiaries argue that the Director long ago waived the opportunity to argue

---

[31]This question is separate and apart from the district court's findings that Arizona violated the free choice provisions. Here, we simply ask the district court to make a factual determination, if appropriate, regarding the statutory basis for Arizona's waiver program to apply in this case.

[32]Section 1396n does not include the "equal access" provision, which is codified under § 1396a. That is why, presumably, Arizona never protested that it is not covered by the "equal access" provision.

that §§ 1396n(c)(2)(C) and (d)(2)(C) are not the relevant statutes, as the case proceeded through seven years of litigation, including a trial that covered the free choice provisions, before the contention was raised. Both parties have attempted to support their arguments by submitting, along with their supplemental briefs, numerous documents that are not part of the district court record. We cannot consider these documents, and so cannot possibly decide the late-blooming dispute over whether the § 1396n requirements apply to Arizona. *See Lowry v. Barnhart*, 329 F.3d 1019, 1024 (9th Cir. 2002) (explaining that appellate courts generally will consider only those facts and documents that have been preserved in the district court record).

On remand, the district court should consider, first, whether, the state is entitled at this late juncture to oppose the free choice cause of action on the ground that § 1396n does not apply to Arizona. The district court is better positioned than we are to make that determination, as it is fully familiar with the course of this litigation.

Second, if it concludes that the issue may be raised, the district court must make a factual determination regarding whether Arizona's HCBS waiver program is, in fact, authorized under § 1315. Third, even if § 1315 proves to be the program's statutory basis, the district court must separately determine whether Arizona is nevertheless bound to comply with §§ 1396n(c)(2)(C) and/or (d)(2)(C) as a condition of receiving federal funds under § 1315, as the Medicaid beneficiaries maintain.

(2)   On remand, the district court should also revisit the Medicaid beneficiaries' ADA and Rehabilitation Act claims, the two claims that survived summary judgment and were litigated during the bench trial but which the district court did not address in its final judgment. The district court should

determine whether Arizona violated those statutes in its administration of the HCBS program.[33]

The district court need not, however, revisit the Medicaid beneficiaries' claims under § 1396a(a)(8), the Medicaid Act's "reasonable promptness" provision, or 42 C.F.R. § 435.930(b), a Medicaid Act regulation mandating that Medicaid, and emergency care, be furnished continuously and without administrative delays, unless a recipient becomes ineligible. The district court granted Arizona's cross-motion for summary judgment on these claims, and the Medicaid beneficiaries never appealed that decision. Although they now ask us to affirm the district court's judgment on these grounds, arguing that we have "the power to affirm the judgment below on any basis found in the record," we may not do so, as the issues were not properly raised on appeal.

The Medicaid beneficiaries correctly assert that "arguments that support the judgment *as entered* can be made without a cross-appeal," although "a cross-appeal is required to support modification of the judgment." *See Engleson v. Burlington N. R.R. Co.*, 972 F.2d 1038, 1041 (9th Cir. 1992) (emphasis added) (quoting C. WRIGHT, A. MILLER, AND E. COPPER, 15A FEDERAL PRACTICE AND PROCEDURE § 3904, 195-96 (1992) (internal quotation marks omitted)). Here we could not, for two reasons, affirm the judgment as entered on the ground that there was a "reasonable promptness" or gap in service violation.

---

[33]The Medicaid beneficiaries have asked us to affirm the district court's judgment on either of these grounds as part of the current appeal and based on the record now before us. We decline to do so. We must remand the matter to the district court for a resolution of the question whether Arizona is bound to comply with the free choice provisions. The district court will then have the opportunity to make the requisite findings of fact and conclusions of law related to the ADA and/or the Rehabilitation Act claims. *See* FED. R. CIV. PRO. 52.

First, were we to affirm the district court on the grounds on which Arizona was granted summary judgment, the terms of the injunction would certainly have to be modified, as the injunction was tailored to remedy a violation of wholly different statutes — § 1396a(a)(30)(A) and §§ 1396n(c)(2)(C) and 1396n(d)(2)(C). *See Lewis v. Casey*, 518 U.S. 343, 360 (1996) ("The scope of injunctive relief is dictated by the extent of the violation established" (internal quotation marks omitted); *Gomez v. Vernon*, 255 F.3d 1118, 1130 (9th Cir. 2001) (explaining that the court's "exercise of equitable discretion" in crafting an injunction must "heel[ ] close to the identified violation") (quoting *Gilmore v. People of the State of California*, 220 F.3d 987, 1005 (9th Cir. 2000)). As we could not simply affirm the judgment on the grounds plaintiff suggests, we may not reach these issues in the absence of a cross-appeal.

Moreover, even if we assume that the Medicaid beneficiaries presented sufficient evidence during the bench trial to support a judgment that Arizona violated § 1396a(a)(8) and 42 C.F.R. § 435.930(b)—which there is no reason they would have, as the issues had been finally resolved against them— the state never had reason to defend against these claims at the bench trial, given its victory at the summary-judgment stage. It would be inequitable to affirm the district court on the basis of an inapposite record. The most we could do as to these causes of action, consequently, would be to reverse the denial of summary judgment to Arizona, not affirm the grant of judgment after trial to the Medicaid beneficiaries. The Medicaid beneficiaries have not asked for such limited relief, nor could that relief support the "judgment as entered." *Engleson*, 972 F.2d at 1041. For this reason as well, we cannot disturb the grant of summary judgment to Arizona in the absence of a cross-appeal.

(3) On remand, and assuming that the district court holds that Arizona violated the free choice provisions, the ADA, or the Rehabilitation Act, the district court will have to modify

the terms of its injunction pursuant to a number of different considerations. Primarily, the injunction will have to be re-designed to reflect the fact that Arizona can no longer be held liable under § 1396a(a)(30)(A). Because the injunction remains in this state of flux, we do not address at this time the state's argument that the injunctive relief originally ordered by the district court was improper because it failed to account for more recent reforms undertaken by the state to improve its HCBS program. Any such review would be premature.[34]

## VI

In conclusion, we reverse the district court's decision that Arizona violated § 1396a(a)(30)(A), the Medicaid Act's equal access provision, pursuant to our circuit's decision in *Sanchez v. Johnson*, 416 F.3d at 1060. We hold that §§ 1396n(c)(2)(C) and (d)(2)(C), the Medicaid Act's free choice provisions, confer upon the Medicaid beneficiaries individual rights that can be enforced under § 1983. We remand, however, to the district court to determine, if appropriate, which statutes and regulations apply to the program. On remand, the district court must address whether Arizona's contention that it is not bound to comply with the free choice provisions has been waived; if not, it must decide that issue; make any appropriate findings of fact and conclusions of law with respect to the Medicaid beneficiaries' ADA and Rehabilitation Act claims; and modify the terms of its injunction, if any, to accord with any statutory or regulatory violations found on remand.

---

[34]We briefly address one last aspect of this matter — namely, the district court's decision to deny the state's motion for a new trial. We review for abuse of discretion. *See De Saracho v. Custom Food Mach., Inc.*, 206 F.3d 874, 880 (9th Cir. 2000). The district court decided that its injunction already accounted for the improvements in the state Medicaid program that Arizona wished to bring to its attention. Further, it found that the state was itself responsible for any evidentiary gaps due to Arizona's opposition to extending the discovery deadline. Denial of the motion for a new trial on these grounds was not an abuse of discretion.

**REVERSED IN PART; AFFIRMED IN PART; REMANDED.**

The parties shall bear equal shares of the costs on appeal.